# Richmond

## THE CHESAPEAKE AND OHIO RAILWAY COMPANY v.
## MACK B. RICHMOND.

September 2, 1976.

Record No. 750956-A

Present, All the Justices.

Aubrey R. Bowles, Jr. (Aubrey R. Bowles, III; Bowles & Bowles, on brief), for plaintiff in error.

*Raymond H. Strople* (*Willard J. Moody; Bernard Miller; Moody,* McMurran and Miller, Ltd., on brief), for defendant in error.

Harrison, J., delivered the opinion of the court.

This appeal by The Chesapeake and Ohio Railway Company is from a final judgment rendered against it in an action brought under the Federal Employers' Liability Act by one of its employees, Mack B. Richmond. Appellee effected a recovery for personal injuries suffered in an accident that occurred while he was performing his duties. The dispositive issue is whether the C & O was guilty of negligence that contributed in whole or in part to cause the injuries.

On February 19, 1973, Richmond was the conductor in charge of a local freight train engaged in switching operations in the C & O's Ronceverte, West Virginia yard. The most southerly track in the yard was designated as the "fill-out track", on which was located a covered hopper car, one of the cars involved in this case. The next track northward was designated as "the passing track", on which Richmond and his crew were proceeding easterly at the time he was injured. The next tracks to the north were the two main lines with which we are not concerned.

Richmond's train arrived in Ronceverte from the west and proceeded easterly on the passing track to the vicinity of the freight depot where Richmond received instructions concerning the switching movement of cars in the yard. The instructions called for the train to pick up a certain freight or boxcar parked on the fill-out track on the south side of the yard, move the car eastward and spot it at the Martin and Jones Hardware Company, located on the north side of the yard. The movement necessitated the permission of the station operator since it required the train to cross the main line tracks.

The train crew consisted of Richmond; Charles D. Harrah, the engineer; and two brakemen, David H. Lilly and Finley E. Bennett. The train proceeded to pick up the designated boxcar from the fill-out track and began "shoving" it on the passing track toward its destination at the hardware company. The train then consisted of that boxcar, which was the first or lead car, followed by the engine, a caboose and another boxcar. Richmond, who was riding on the brake platform of the east or front end of the boxcar being pushed, had released the car's brakes. Harrah was sitting on the seatbox on the right side of the engine. Lilly was on the right front side step of the engine. Bennett was riding on the west end of the caboose. The train was moving at about eight mph. Testimony indicated that the lead boxcar was of a standard size, 50 feet 6 1/16th inches in length, 10 feet 4 1/2 inches in width and 15 feet in height.

The brakes of the boxcar are controlled by a rod which extends from the braking mechanism to a brake wheel near the top of the car. At a point in front of and attached to the boxcar, and located about three to four feet from the top, is the brake platform described as being six inches in width by twenty-four inches in length. A trainman stands on this platform to have access to the brake wheel and to be in position to operate the brakes. Attached to the left front of the boxcar, as one faces it, is a ladder by which access is gained to the brake platform and to the top front of the car. To the left of this ladder and just around the left corner of the boxcar is another ladder which reaches from the top of the car to a step, or "stirrup", located between the bottom of the car and the bed of the railroad. The grab irons of this ladder project about 2¾ inches from the side of the car. Trainmen stand on the stirrup of this ladder during switching operations so that they may be clearly visible when giving signals to the engineer.

The covered hopper car, which was involved in the accident, is 52 feet 1/2 inch long, 10 feet 7 3/4 inches wide, and 15 feet 1 inch high. A welded metal strip eight inches wide extends one-fourth inch from the center of the car on the north side.

The clearance between the corner of the moving boxcar on the passing track and the corner of the stationary hopper car on the fill-out track was measured to be 21 1/2 inches at the point of the accident and at a height of eight feet from the rail.

Richmond, riding on the brake platform on the front end of the boxcar being shoved eastward on the passing track, moved around the southeast corner of the car from the brake platform to the side ladder. In the course of making this movement he struck the northwest corner of the hopper car and injured his right shoulder. The accident was witnessed by the two brakemen. Bennett's version is as follows:

> "Well, we were watching, all of us, I suppose, at least I was watching the eastbound movement there. As we approached the car, the covered hopper in the fill-out track, Mr. Richmond moved from the brake step or attempted to move from the brake step to the side ladder. As the two cars met, just about the time he came from the brake step around to the side ladder, it caught him between the two cars."

Lilly testified:

"Mack [Richmond], as we were shoving eastward through the

passing siding and approaching those covered hoppers that were on the fill-out track, stepped around from the end of the car, around onto the side ladder.   *   *   *   *   *

"Just as he got around on the side ladder, that is when his right shoulder struck the northwest corner of the westernmost covered hopper sitting on the passing siding, and it knocked him off.
        *   *   *   *   *

"Just the instant—just about the time he came around, just almost instantaneously when he struck the car, of course I yelled to the engineer and he went into emergency.
        *   *   *   *   *

"He hit the corner of the covered hopper. . . ."

Richmond, who said that he never saw the hopper car, testified as follows:

"Well, I was riding on the east end of the car on the brake platform, as well as I remember, with my left hand on the rail or whatever you want to call it, on the top of the car. Whenever I got up to make my move to come down the side ladder I caught it with my right hand and stepped around to the left, and that's the last I remember. It just looked to me like this car just come right up in my face, and that was it."

In his report of the accident, made a few days thereafter, Richmond said that he "[w]as riding on leading end of C & O 21354 boxcar on brake platform. Swung around to side of car and was struck by B & O 602154 standing in fill-out track next to passing side we were on".

This action was brought under the Federal Employers' Liability Act, and the C & O is liable to Richmond if his injuries were caused in whole or in part by the railroad's negligence. *Seaboard Coast Line Railroad* v. *Ward*, 214 Va. 543, 202 S.E.2d 877 (1974). Contributory negligence is not a defense. It only mitigates damages. *Norfolk Southern Ry. Co.* v. *Rayburn*, 213 Va. 812, 195 S.E. 2d 860 (1973). The C & O cannot defend on the ground of assumption of risk for such defense has been abolished. 45 U.S. C. § 54 (1964). Richmond, having received a verdict by the jury, which has the approval of the trial judge, is entitled to have the evidence viewed by us in the light most favorable to him. *Riley* v. *Harris*, 211 Va. 359, 177 S.E.2d 630 (1970). Here we need look only to the evidence and reasonable inferences which tend to support appellee's case. *Wilkerson* v. *McCarthy*, 336 U.S. 53 (1949).

Counsel for Richmond cities numerous cases, including *Rogers* v. *Missouri Pacific Railroad Co.*, 352 U.S. 500, 506-07 (1957), where, in reviewing the sufficiency of the evidence in a Federal Employers' Liability case, the Supreme Court stated:

"Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death. Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities. The statute expressly imposes liability upon the employer to pay damages for injury or death due 'in whole or *in part*' to its negligence. [Footnotes omitted]."

The C & O concedes that *Rogers* makes it clear that under the FELA the test of a jury case is whether there is proof that negligence by the employer played even the slightest causative part in producing the injury involved. However, appellant says there is no intimation in *Rogers*, or in any other case, that causative negligence of the employer has been abolished as a prerequisite to recovery. It further contends that the Act does not make the employer an insurer. It cites *Moore* v. *Chesapeake & O. Ry. Co.*, 340 U.S. 573, 578 (1951), where the Court said, "Speculation cannot supply the place of proof", and *Brady* v. *Southern Ry. Co.*, 320 U.S. 476, 479-80 (1943), where it was held:

"The weight of the evidence under the Employers' Liability Act must be more than a scintilla before the case may be properly left to the discretion of the trier of fact—in this case, the jury. [cases cited] When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding by non-suit, directed verdict or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict. By such direction of the trial the result

is saved from the mischance of speculation over legally unfounded claims. [cases cited]."

The testimony is remarkably free of conflict. Clearly Richmond attempted to transfer from the brake platform to the side ladder of the boxcar at the very instant the southeast corner of the boxcar reached the northwest corner of the hopper car. The maneuver which he made, while not unusual, was difficult at best. In order for Richmond to move from the brake platform to the side ladder it was necessary that he first cross over to the front ladder of the boxcar, and then from there swing or move around the corner of the car to the side ladder. Before making this move Richmond had been riding at a place on the car where he should not have been. The railroad's operating Rule 103A provides:

"When shoving tracks . . . a man must be stationed on the leading car . . . in position to be clearly seen to give signals, unless the movement is otherwise protected."

The movement was not otherwise protected. The only trainman who had a clear view to the front of the boxcar, and both to the left front and right front thereof, was Richmond. Rule 103A envisions that a trainman will be standing on the stirrup of the side ladder of the lead car where any signal given by him will be clearly visible to the engineer. Richmond was not on his station and could not be clearly seen by the engineer. In fact the engineer knew only that "he was somewhere in the vicinity of the car".

Richmond's explanation that the car was to be pushed a good distance, and that it was more comfortable to ride on the brake platform than to ride holding to a ladder with his feet in the stirrup, does not excuse his violation of the rule. There was no other crewman on the train in a position to protect the movement of the train. Lilly was on the right front steps of the engine immediately below the engineer and obviously he could not see to the left front of the train because the front of the engine and the boxcar obstructed his view. Neither could Bennett see to the left front of the train for he was on the right side of the caboose and even more remote from the front of the boxcar.

Richmond, as the conductor, was the trainman primarily responsible for the movement of the train and the safety of the crew and others. He failed to maintain a proper lookout in the direction in which the train was moving; therefore, he was in violation of Rule 182 which provides:

"Employees will maintain a lookout in the direction of movement to avoid coming in contact with structures or obstructions alongside of track, or with cars, locomotives, or trains on adjacent track. When vision is obscured, or location is indefinite, they will keep in the clear."

Richmond admitted that he never saw the hopper car, notwithstanding there was no obstruction in front of him, and the car was in a fixed position and clearly visible. The hopper car was seen by other members of the crew. They had no reason to suspect that Richmond had not seen the car and was not aware of its presence on the adjacent track. Richmond's train had passed the car on two previous occasions that morning, prior to the accident.

One object of Safety Rule 182 is to avoid exactly the type of accident which occurred in this case. Employees are required to maintain a lookout forward *to avoid coming in contact with cars on adjacent tracks*. If their vision is obscured, or the location of cars on the adjacent track is indefinite, trainmen are required "to keep in the clear". This means staying in a position of safety. Richmond had alternatives. He could have remained on the brake platform until the car had cleared the hopper car; he could have moved over to the front ladder so as to be in position to move quickly to the side ladder when the hopper car was cleared; or he could have ridden on the side ladder, where the safety rules required him to be, and stood erect against the grab irons until the hopper car was cleared. Instead, without looking, or without seeing what was there to be seen, he unfortunately moved or swung from the front around to the side of the car at precisely the time and place the movement should not have been made, and was thereby injured.

Richmond testified that he intended to move from the brake platform to the side ladder in order to be in position to watch out for people at the crosswalk and to give signals to the engineer. He also said that he planned to get off the boxcar east of the passenger station and make arrangements with the dispatcher for it to be pushed across the main line. However, Lilly testified that the point where the accident occurred was approximately 18 car lengths, or 900 feet, from the crosswalk. Appellee therefore had ample time in which to move to the side ladder after the train had cleared the hopper car.

Appellee alleges that his injury was caused in whole or in part by the negligence on the part of the C & O. To prove negligence, he sought to establish the close clearance between the boxcar and the

hopper car; the failure on the part of C & O and his fellow trainmen to warn him of the danger; and the unsafe condition of the C & O's roadbed.

Frequent reference was made to the hopper car as a "jumbo hopper". The clearance between this car and a boxcar is only 1 5/8 inches less than is the clearance between two boxcars. While there is no proof that a clearance of 21 1/2 inches between the cars was not adequate for a man standing erect on the stirrup of the side ladder, Richmond was not standing on the ladder; he was trying to reach the ladder and then descend it. Witnesses testified that this type hopper car is not unusual in any manner and that thousands are currently in use. The engineer Harrah testified, referring to the hopper cars, "All the cars we handle now are those type of cars."

Richmond alleged that the C & O was negligent in not warning him of a dangerous situation. This accident occurred in a railroad yard where cars are constantly being moved in, stored and moved out. Railroad cars are of various kinds, shapes and sizes, and all railroad employees know this. It was a routine switching operation that was being conducted by Richmond and his crew. Richmond is an experienced trainman, having had 27 years service at the time of this accident. He was familiar with the Ronceverte yard, with freight cars generally, and with the job that he was doing. Rule 182 is a warning to trainmen to maintain a lookout for close clearance by reason of cars on adjacent tracks. None of Richmond's fellow employees could have reasonably foreseen that he would make the maneuver that he made at the time and place that he made it. Nor did they have sufficient time to give a warning even if such a warning had been indicated. Bennett said the accident occurred *just as the two cars met* and as Richmond came from the brake step to the side ladder. Lilly said it happened *just the instant, almost simultaneously* when Richmond came around to the side ladder. Richmond never saw the hopper car and said that *when he made his move*, or swung around to the side of the car, that was the last thing he remembered. Richmond was himself in the best position to see the hopper car and to note its "dangerous proximity" on the adjacent track, if in fact the hopper was so near the boxcar as to pose any threat of danger to him.

The testimony regarding the condition of the roadbed and the swaying and rocking of the car was vague and affords a basis for speculation only. On cross-examination Richmond was asked: "You are now telling the jury that it was not the close clearance, but the

rocking of the car that knocked you off the car?" Appellee replied: "I'd say it was the rocking of the car that knocked me off, yes, sir, or swaying, whichever you want to call it." In his statement made soon after the accident Richmond did not complain of the condition of the roadbed or the rocking or swaying of the boxcar. It was at trial that he first testified : "This car that I was riding rocked backwards and forwards." However, when asked, "What if any problems can it [rocking] cause to you as a conductor or brakeman?", appellee responded: "Well, I don't really know as there would be any difference riding the side ladder than there would be up on the platform when there is a swaying." The sum of appellee's testimony was that the track conditions throughout the whole Ronceverte area were "pretty bad".

No witness testified as to any specific defect in the track at the point where the accident occurred, or testified that there was any depression, elevation or unusual condition at that point. There was testimony by Lilly that in the general area there were places where the ballast under the ties was loose and that that sometimes caused a rocking motion. Lilly, when asked if he was in a position to say that that condition existed where the accident happened, responded: "No. I can't say it existed where the accident happened." He further said that he didn't remember seeing any rocking of the car, and that he couldn't say that the car rocking had anything to do with the accident.

Robert Sams, trainmaster, testified that he had never received any complaint from Richmond regarding the condition of the ballast or the condition of the passing track in the Ronceverte yard. When asked by counsel for appellee if railroad cars traveling over the tracks would rock and roll and sway, Sams answered: "Well, railroad being railroad, on the best kept track a car will sway."

In our view of the record, there is no evidence, nor any inference which reasonably may be drawn from the evidence when viewed in the light most favorable to the appellee, which could sustain the verdict. We find no rational basis for concluding that there was negligence by the C & O which contributed in whole or in part to the injuries suffered by Richmond.

Clearly, under the circumstances that existed, there was no duty on the part of appellant or appellee's fellow trainmen to have warned Richmond of the presence of the hopper car. Neither was there evidence from which the jury could have found that the C & O's roadbed was so defective at the point of the accident as to have contributed to its happening. Unlike *Ellis* v. *Union Pac. R. Co.*, 329 U.S. 649

(1947), which involved an overhang of a car, a tilt on a curve toward a building, and a higher outside rail, there is no evidence here of any disparity in the height of the rails, and the two adjacent tracks involved were straight. We can safely assume that there was some rocking or other motion of the boxcar on which Richmond was riding, notwithstanding this car was being pushed at a speed of only eight mph. A degree of rocking and swaying of rail cars is present whenever such cars are moved. However, there is no evidence in the instant case that this was caused by any negligent act or omission on appellant's part.

To hold that the C & O was negligent in having placed the hopper car on the fill-out track would in effect say that any railroad is negligent as a matter of law if it parks a railroad car where its side will be 21 1/3 inches from cars passing on an adjacent track. In the instant case it was not the amount of clearance between the two cars that proximately caused or effectively contributed to cause the accident suffered by Richmond.

The real cause of Richmond's injuries was his own negligence, and the acts of the employer alleged to constitute negligence played no causative part. We need only consider the evidence of Richmond and his fellow trainmen. Richmond admits that he did not see the hopper car. He did not know or had forgotten it was on the fill-out track. When he made his move around the corner of the boxcar he was completely oblivious of its presence. This admission not only convicts Richmond of a violation of Safety Rule 182, but of negligence. Although Richmond was on the brake platform, where he did not belong, during the pushing operation, he was in a place of safety so far as any "contact with structures or obstructions alongside of track, or with cars, locomotives, or trains on adjacent track" was possible. We do not have to speculate on why he attempted to move from the front to the side of the boxcar at the exact time and place and in the manner he did, instead of waiting the few seconds necessary for the cars to pass. The appellee provided the answer when he admitted that he was unaware of the presence on the adjacent track of a hopper car with which he had to avoid coming into contact.

We conclude that the evidence established as a matter of law that Richmond's independent and negligent act was the sole cause of the accident and his injuries. No negligence of the C & O was shown that contributed in whole or in part to the accident.

*Reversed and final judgment.*

I'Anson, C.J., dissenting.