## CIRCUIT COURT OF THE CITY OF PORTSMOUTH

John R. Wilson

    v.

Norfolk and Portsmouth
Belt Line Railroad Co.
and Ford Motor Co.

October 14, 2005

Case No. (Law) 05-451

BY JUDGE MARK S. DAVIS

    This matter is before the Court, pursuant to Va. Sup. Ct. Rule 4:12(a), on plaintiff's Motion to Compel defendant Norfolk and Portsmouth Belt Line Railroad Company (hereafter "NPBL") to produce an accident investigation report and investigation memorandum and plaintiff's Request for Entry and Inspection of the accident site. Both of these are directed to NPBL. Defendant NPBL objects to the Request for Entry and Inspection, as well as the Motion

to Compel. The factual and procedural background of this matter, discussion of the issues, and conclusions are set forth below.[1]

## I. Factual and Procedural Background

### A. Motion for Judgment and Cross-Claims

On February 23, 2005, the plaintiff, John R. Wilson, filed his motion for judgment against defendants NPBL and Ford Motor Company (hereafter "Ford") seeking judgment jointly and severally in the amount of $1,000,000.00. In count one, plaintiff asserts a claim against NPBL pursuant to the Federal Employers's Liability Act ("FELA"), 45 U.S.C. §§ 51-60, as amended. Specifically, plaintiff alleges that "[o]n or about August 11, 2003, Plaintiff was one of NPBL's employees and was assigned to work at the Ford Motor Company Plant in Norfolk, Virginia, and while working in the course of his employment for NPBL and performing his duties as one of NPBL's employees, Plaintiff was injured." Plaintiff further alleges that "NPBL negligently and carelessly: (a) failed to provide Plaintiff with a reasonably safe place to work; (b) failed to properly maintain its track, roadbed, and right-of-way; (c) failed to properly inspect and maintain the area(s) where its employees, including Plaintiff, would be required to work; (d) failed to eliminate "close clearances"; (e) failed to promulgate appropriate rules, regulations, policies, or procedures for the safe and proper performance of its work; (f) and was otherwise negligent." Plaintiff concludes that NPBL has therefore failed to comply with the provisions and requirements of the FELA and that, as a result, he sustained injuries to his left upper arm and left shoulder. In count two plaintiff asserts a negligence claim against Ford.

NPBL filed its grounds of defense on March 7, 2005, generally denying any negligence or violation of the FELA and asserting various affirmative defenses. At the same time, NPBL filed a cross-claim against Ford asserting that NPBL and Ford "entered into an agreement ("Agreement") dated October 21, 1946, whereby Ford agreed to 'indemnify and hold harmless' NPBL

---

[1] Plaintiff Wilson was represented at the August 5, 2005, and September 6, 2005, hearings by Willard J. Moody, Jr., Esquire, and Michael R. Davis, Esquire, with the firm of Moody, Strople, Kloeppel, Basilone, & Higginbotham, Inc. Defendant NPBL was represented at the August 5, 2005, hearing by W. Ryan Snow, Esquire, with the firm of Crenshaw, Ware & Martin, P.L.C., and he was joined at the September 6, 2005, hearing by James L. Chapman, IV, Esquire, of the same law firm. Defendant Ford was represented at the August 5, 2005, and September 6, 2005, hearings by Brian A. Richardson, Esquire, with the law firm of Bowman and Brooke, L.L.P.

'[a]gainst all claims for damages for injuries to or death of any of the employees of the Railway Companies [NPBL and Virginia Railway Company] arising by reason of the erection of any buildings, structures, or fixtures of any kind owned, used, or controlled by Ford in dangerous proximity to said tracks, or arising from any negligence on the part of Ford, its employees, or agents." Accordingly, NPBL asserts that "[i]f plaintiff suffered injury and damages as alleged in Count I of the Motion for Judgment, which NPBL has denied, then Ford is liable over to NPBL by way of indemnification for any and all sums for which NPBL is liable to the Plaintiff under Count I of the Motion for Judgment."

On March 23, 2005, Ford filed a grounds of defense to plaintiff's motion for judgment, generally denying any negligence on its part and asserting various affirmative defenses. On May 20, 2005, Ford filed its grounds of defense to NPBL's cross-claim, asserting various affirmative defenses and generally denying liability to NPBL or plaintiff, while admitting "that Ford and NPBL entered into an agreement on October 21, 1946, and that the terms of the agreement speak for themselves." Ford also filed a cross-claim against NPBL on May 20, 2005, asking the "Court to award it judgment against [NPBL] in the amount of any judgment that is awarded by this Court to Plaintiff against Ford." On June 13, 2005, NPBL filed its grounds of defense and affirmative defenses to Ford's cross-claim generally denying the allegations made by Ford

B. *Discovery*

1. *Motion for Entry and Inspection*

On May 9, 2005, plaintiff filed a "Motion for Entry Upon Premises and to Preserve Accident Site." Specifically, the motion asks the Court to enter an "Order permitting the Plaintiff's counsel, a photographer, the Plaintiff, and witnesses to enter upon the premises of the Defendant's property for the purposes of inspecting, measuring, and photographing the area where Plaintiff was working at the time of the incident alleged in the Motion for Judgment." The motion also requests that the Court "instruct the defendant to preserve the site of the accident including the fence and track where plaintiff's injury occurred," though it does not indicate to which defendant it is directed.

On June 1, 2005, NPBL filed an objection to plaintiff's Motion to Enter Upon Premises and to Preserve Accident Site, stating that "NPBL objects to the Motion to Enter Upon Premises on grounds that NPBL does not own the property plaintiff seeks to enter and cannot agree to the request

without consenting to a trespass." NPBL further asserted that "the area at the Ford Motor Plant where plaintiff alleges he was injured is owned on one side by Ford Motor Company and on the other by Norfolk Southern Corporation." NPBL argued that it "is not obligated under the Rules to allow plaintiff to enter and inspect another's land" and that the "Court should not order entry upon land without all owners represented." NPBL also objected that the motion failed to identify the manner and period of inspection, as well as the "witnesses" plaintiff seeks to have present at the entry.

NPBL further objected to the motion to preserve the accident site on the grounds that the Motion is untimely and moot because the accident alleged occurred on August 11, 2003, and such motion was not filed until May 6, 2005. NPBL asserts that plaintiff knows that "the current condition of the site is not representative of the condition on August 11, 2003" since NPBL stated, in answer to plaintiff's interrogatory number eight, that "following plaintiff's claim that he brushed his arm on a fence post, 'Mr. Rodgers issued a close clearance bulletin and instructed Mr. Bradshaw to reposition [the] fencepost'." Accordingly, NPBL asserts that to "require NPBL to now preserve the site on property it does not own is unwarranted."

By notice of July 7, 2005, plaintiff filed a Motion to Compel, noting that he served NPBL and Ford with an Amended Request for Entry and Inspection. Such Amended Request sought "entry onto Track # 3 and the land immediately adjacent thereto, along the eastern side of the Ford Motor Company Plant in Norfolk, Virginia," and that "[u]pon information and belief, all such property is either within the 'possession or control' of either or both Defendants." The Amended Request also contains the following statement:

> Plaintiff seeks to inspect, measure, survey, and photograph Track # 3, with and without the presence of railroad cars thereon, so as to allow accurate measurements to be taken with respect to the clearance distances between Track # 3 and the fence adjacent thereto. Plaintiff also seeks to inspect, measure, survey, and photograph the fence adjacent to Track # 3 and the fence post that caused his injury.

The Motion to Compel goes on to state that Ford has previously indicated it will permit the plaintiff entry on the land immediately to the west of the fence, but that plaintiff's accident took place on the eastern side of the fence, and "NPBL has previously indicated that it will not permit Plaintiff onto the designated property for purposes of this inspection." Plaintiff states in his motion that, since his "central allegation in this case is that NPBL and Ford created or permitted a

'close clearance' between Track # 3 and the subject Fence," . . . "[i]t is essential to Plaintiff's case that he be permitted to inspect, photograph, and measure the property and objects identified in Exhibit 'A'."

On July 29, 2005, NPBL filed its objection to plaintiff's amended request for entry and inspection. NPBL stated plaintiff alleges he sustained injury when he "brushed his shoulder on a Ford Motor Company fence post" and seeks: (1) an "Order granting plaintiff, his counsel, a photographer, and witnesses entry upon property at the Ford Motor Plant not owned by NPBL," and (2) "to compel NPBL to place railcars it does not own on Track 3 at the Ford Motor Plant, which it also does not own, for purposes of measuring 'clearance distances between Track 3 and the fence adjacent thereto'." NPBL notes that plaintiff seeks these measurements despite the fact that the fence post was repositioned two years ago. NPBL responds that "[u]pon information and belief, the area at the Ford Motor Plant where plaintiff alleges he was injured is owned on one side by Ford Motor Company and on the other by Norfolk Southern Railway" and goes on to assert that (as of that time) plaintiff has apparently made no effort to seek Norfolk Southern Railway's consent to enter upon and inspect such land. NPBL asserted that since Va. Sup. Ct. Rule "4:9 limits a Court's authority to allow entry upon land to only such 'land or other property in the possession or control of the party upon whom the request is served.'. ." and that, since "NPBL neither owns nor controls the property plaintiff seeks to enter," . . . "this Court is without authority to allow the inspection."

NPBL also responded that "Track 3, like the land on which it sits, is not owned by NPBL," but "[u]pon information and belief, Track 3 is owned by Norfolk Southern Railway." Furthermore, NPBL claims that it does not own the railcars plaintiff seeks to move. NPBL points out that it "cannot be compelled to place railcars it does not own on a track it also does not own without the consent of the owners of the property," and that, even if it owned the property, it should not be required to place railcars on the track "when the position of the fence post at Track 3 has changed since August 2003." NPBL reiterates that it "long ago advised plaintiff that, on the very day after the incident, 'Mr. Rodgers issued a close clearance bulletin and instructed Mr. Bradshaw to reposition [the] fencepost'." NPBL concludes that, since the fencepost was long ago repositioned, any measurement now can reveal only irrelevant information, and the "considerable burden, inconvenience, and expense of such a procedure far outweigh any possible benefit." NPBL further asserts that, even if it possessed or controlled the property, it should not be required to move railcars without a release signed by plaintiff, and it asserts that plaintiff has not identified the witnesses he seeks to have enter the land.

### 2. Requests for Production of Documents

The plaintiff's Motion to Compel also seeks an order from this Court compelling NPBL to respond completely to requests for production of documents seeking "[a]ny and all written reports or summaries that were prepared following the Incident." Plaintiff states that "NPBL has identified a memorandum prepared by Leon Rodgers pertaining to statements allegedly made by the Plaintiff during the three weeks immediately following the subject" and that "NPBL is withholding the document under a claim of privilege" but "has not identified the date the memorandum was created, nor indicated what prompted Mr. Rodgers to create it." Plaintiff requests that the Court order production of the document or conduct an *in camera* review of the memorandum. Plaintiff further states that "NPBL has identified an accident report created by Leon Rodgers, which it is withholding under a claim of privilege" and plaintiff similarly requests the Court to order production of such report or conduct an *in camera* review of the report.

### C. *August 5, 2005, Hearing*

At the August 5, 2005, hearing on these matters, plaintiff's counsel represented that the parties had resolved many of the issues addressed in their motion to compel, but that the issues of plaintiff's entry onto the land and production of the two documents prepared by Leon Rodgers remained for decision. Plaintiff's counsel stated that Ford had no objection to entry on their property, but that plaintiff still needed to enter the property on the other side of the fence. Plaintiff's counsel also said that NPBL advised that Norfolk Southern Corporation owns the property on that side of the fence, but plaintiff's counsel asserted that Norfolk Southern Corporation owns 57% of NPBL and therefore has the ability to control NPBL.[2] NPBL responded that Norfolk Southern Corporation does own a majority of NPBL, but that they are separate entities and NPBL does not possess or control the Norfolk Southern Corporation property.

NPBL again asserted that there is a written agreement between Norfolk Southern Corporation and NPBL that controls NPBL's use of the subject tracks, but that the limit of the authority granted to NPBL in such agreement is to roll cars down the track, not to engage in other activities that could subject Norfolk Southern Corporation to potential liability. During the hearing, plaintiff responded that the statute of limitations against Norfolk Southern Corporation

---

[2] Plaintiff made no representation that there was a corresponding reverse control relationship such that NPBL had the ability to control Norfolk Southern Corporation's actions.

would expire on August 11, 2005, and, since NPBL disclaimed control of such property, asked that the Court order NPBL to produce the agreement with Norfolk Southern Corporation so that plaintiff would have time to consider whether he needed to add them as a defendant before the statute of limitation expired. The Court ordered NPBL to produce such written agreement by August 10, 2005.

Plaintiff's counsel also indicated during the hearing that no resolution had been reached with NPBL regarding plaintiff's request for production of Leon Rodgers' written memorandum containing statements of the plaintiff within the three weeks after the incident, as well as an accident report prepared by NPBL. NPBL stated that it had reported, in its interrogatory answers, what statements were made in those documents, but that the "work product doctrine" protects both documents because they were prepared in anticipation of litigation as part of NPBL's investigative process. NPBL stated that Rodgers is the terminal superintendent and that the memorandum contains impressions, not recitations of witness statements, just a summary of them.

Plaintiff's counsel responded that other Virginia circuit court judges have ruled that documents prepared *before* an employee's notice of claim is filed are not prepared in anticipation of litigation and are, therefore, not subject to the work product doctrine, whereas documents prepared *after* the notice of claim is filed are covered by the work product doctrine. Plaintiff's counsel also argued that, in cases where courts have applied the work product doctrine to railroad accident reports prepared before a notice of claim is filed, such work product protection is more properly viewed as an application of the "self critical analysis" privilege. Therefore, plaintiff's counsel urged the Court to review the accident report *in camera*.

Without resolving the dispute on the work product issue, the Court indicated that the parties should submit the accident report and memorandum, with case support, by August 30, 2005. The Court also indicated that the parties should submit their case support regarding the issue of entry upon land at the same time and continued the hearing to September 6, 2005, for further argument and the presentation of any evidence the parties might wish to submit.

On August 30, 2005, counsel for plaintiff provided the Court with cases from state and federal courts supporting plaintiff's motion to compel production of the memorandum and accident report,[3] and indicating that the posture of the

---

[3] *Terry M. Williams v. Norfolk and Western Ry.*, At Law No. L-90-823 (Portsmouth Circuit Court, Nov. 7, 1990); *Edgar L. Williams v. Norfolk and Western Ry.*, At Law No. L-89-2732 (Portsmouth Circuit Court, October 10, 1990); *Bruce Royster v. Norfolk and Western Ry.*, Civil

matter had changed since Norfolk Southern Corporation "has specifically granted plaintiff's counsel permission to go upon the premises for the purpose of performing a site visit. . . ."[4] However, plaintiff's counsel also indicated that NPBL has not agreed to place a train on the track running over the Norfolk Southern Corporation land such that plaintiff can "make measurements between the fence that the plaintiff struck and the adjacent track. . . ." Accordingly, the only issue remaining for the September 6, 2005, hearing involving entry on the land was whether NPBL must place a train on the track during such entry so that plaintiff can take measurements while the train is on the track over Norfolk Southern Corporation property.

On August 30, 2005, defendant NPBL's counsel also provided the Court with a brief in opposition to plaintiff's motion to compel production of documents. NPBL counsel continued to assert that the disputed documents are privileged "work product" and enclosed copies of the disputed documents for *in camera* review by the Court in preparation for the September 6, 2005, hearing. The Court conducted an *in camera* review of the documents prior to the September 6, 2005, hearing.

## D. *September 6, 2005, Hearing*

The parties reconvened, and the Court resumed the hearing on these matters on September 6, 2005. Joseph Donnelly, the Vice President/Secretary/Comptroller of the NPBL, testified that he has worked at the

---

Action No. 90-1238-N (U.S. Dist. Ct., E.D. Va. July 18, 1990); *John W. Cooper v. Norfolk & Portsmouth Beltline*, At Law No. L-00-157 (Portsmouth Circuit Court, June 5, 2000).

[4] Plaintiff indicated at the September 6, 2005, hearing that an agreement was reached between himself and Norfolk Southern Corporation, solely for purposes of *this* litigation, for specific individuals to enter the premises and to execute a release of liability in order to do so. The permission given by Norfolk Southern Corporation obviates the need for the Court to determine whether NPBL has sufficient possession or control, pursuant to its usage agreement, to permit the requested entry. *See Santa Fe International Corp. v. Potashnick*, 83 F.R.D. 299, 301 (E.D. La. 1979) (discussion of right of general access versus limited access). Norfolk Southern Corporation's agreement to permit entry also obviates the need for the Court to resolve the question of whether the reference to "tangible things" in Va. Sup. Ct. Rule 4:9(c), addressing production by a non-party, includes realty. As Professor Bryson points out in his treatise, *Virginia Civil Procedure*, realty is specifically mentioned in Va. Sup. Ct. Rule 4:9(a), but omitted in Va. Sup. Ct. R. 4:9(c). Because of Norfolk Southern Corporation's grant of permission for entry, it is unnecessary for this Court to decide whether such omission implies exemption of realty from production by persons not parties, W. Hamilton Bryson, *Virginia Civil Procedure*, p. 407 (3rd ed. 1997), or whether a separately-filed action seeking a traditional pure bill of discovery would provide an avenue for obtaining such information. *Id.* at 407, *see* Lile, *Equity Pleading and Practice*, § 135.

NPBL for over nineteen years. He said that there is a rail siding at the Ford Plant where plaintiff alleges he was injured. Both Ford and Norfolk Southern Corporation own tracks at this location, with the Ford property line delineating the track ownership. He said that the agreement (referenced above) for the movements of rail cars on this siding is between Ford, Norfolk Southern Corporation, and NPBL. NPBL employees regularly recover the rail cars at the interchange with Norfolk Southern Corporation. Norfolk Southern Corporation owns the cars that are used at the Ford plant, and NPBL leases the locomotives used to move the cars. The cost to NPBL for leasing these locomotives is $300.00 per day, excluding fuel and crew personnel costs. NPBL does not lease a locomotive unless they have an actual need for it that day.

Donnelly said that NPBL places the cars at the Ford Plant as directed by Ford. The Ford Plant is an assembly plant, not a manufacturing plant. The parts utilized in the assembly of vehicles arrive via this rail line. Because Ford uses "just in time delivery" in its assembly operation, Ford manages the delivery operations and NPBL's role in such delivery so that the parts are delivered just in time for the assembly of the vehicles. For this reason, the sorting and order of the cars is very important. In conducting such placement, the locomotives generally have an engineer who operates the locomotive, a conductor who directs such operation, and (many times) a utility brakeman. The plaintiff in this case was working as a conductor at the time of the alleged incident. NPBL generally places a crew at the Ford Plant for an eight hour shift, and they have two to three of these shifts operating consecutively at the plant, not overlapping. In order to conduct the sorting operations to make sure the parts arrive in the order needed by Ford, NPBL sorts the cars into the proper order using the various side tracks at the plant.

Mr. Donnelly was asked whether placement of a rail car at the scene of the alleged incident would disrupt NPBL activities, and he responded that, if an experienced crew conducted the placement, then it would likely necessitate a delay with the consequent payment of overtime to NPBL employees. Use of an inexperienced crew might, in addition to causing a delay, create a disruption of the process. He admitted that there are times when NPBL might only have one crew at the plant, such as on weekends or holidays, though the Ford Plant is not currently working weekends. Donnelly said that, when a job is over, the crew tries to clear the empty cars out of the side track, and he was not sure of the extent to which empty cars might sit on track number three in holding patterns. He also noted that Norfolk Southern sometimes delivers a car directly to Ford, and sometimes NPBL will move such cars that are not being used to its own Berkley site to await a need for their use. Donnelly said that the boxcars used for deliveries to the Ford Plant are of a uniform size.

162

When asked about possible danger involved in a potential site inspection with a box car being placed at the location of the alleged injury, Donnelly said that as with any railroad site, there is danger inherent in being on site while operations are taking place. He said that normally, during a site inspection by visitors, NPBL will "blue flag" the tracks, in essence shutting down the tracks being utilized for the site visit, as well as the adjacent tracks, for safety purposes.

When asked about the circumstances under which the accident report, entitled Personal Injury Summary Report (PISR), and the investigation memorandum were prepared, Donnelly noted that he has managed personal injury claims at NPBL for ten to fifteen years and that NPBL is self-insured for its claims. He said that, when an employee reports an injury to NPBL, they first assure that the employee has medical attention as needed. He said NPBL then documents the event in anticipation that a formal claim may be filed and that litigation may follow. Donnelly said that ninety-five percent-plus of NPBL work-related incidents result in a claim being filed. He said the long-standing policy of NPBL is to begin their investigation of such incidents immediately and that, when the operating supervisor is on duty, he typically performs the investigation of the incident. He said that in this case, the on-duty supervisor at the time plaintiff reported the incident was Leon Rodgers.

Donnelly admitted that, in response to such incidents, NPBL sometimes takes action for employee safety and not because it is anticipating litigation. He cited as an example of this the fact that NPBL repaired the leaning fence post at issue here after plaintiff reported the incident to Rodgers. He said that in order to initiate such a repair, NPBL files a "reportable condition" form, and Donnelly said that such reports are not filed in anticipation of litigation. Hence, according to NPBL, the reportable condition form prepared in the regular course of NPBL's business was produced to plaintiff in discovery.

Donnelly further stated that, unlike the reportable condition report, the Personal Injury Summary Report (PISR) at issue here, as in all NPBL incidents, was prepared in anticipation of litigation. He said that, in this case, the PISR was prepared by T. L. Hobbs at his, Donnelly's, direction.[5] Donnelly noted that the PISR is different from the Personal Injury Report (PIR) form that the injured *employee* actually completes and files. He said that plaintiff did complete the Personal Injury Report and filed it on August 19, 2003. Donnelly said that the regulations of the Federal Railway Administration (FRA) did not require reporting of the injury until August 27, 2003, because none of the requirements for a reportable incident had been met. According to Donnelly, an incident must

---

[5] NPBL previously indicated that Rodgers prepared the PISR. However, the PISR does reflect Hobbs as its author.

be reported to the FRA when an employee loses time as a result of an on-the-job injury, when an employee receives certain medical treatment as a result of an on-the-job injury, or when an employee receives certain medications as a result of an on-the-job injury. However, Donnelly said that, even if none of these triggering events has immediately taken place, NPBL normally begins its investigation immediately upon learning of an incident, as it did here. The PIR admitted as NPBL Exh. # 1 contains a notation at the top of the document as follows: "incident changed to reportable injury 8/27/03."

Donnelly stated that he is "almost certain" that he contacted NPBL's general counsel, James Chapman, Esq., on the morning that plaintiff's injury came across his desk on the "morning report," which he thought was within a day or so of the incident itself. Donnelly said that he normally makes such contact with railroad counsel when an injury comes to management's attention, even a "muscle strain." Donnelly said that as soon as he learned of the incident, he presumed plaintiff Wilson would file a claim because there was an incident alleged and because Wilson is a union representative who is presumably aware of his FELA rights as a result of that union position. Donnelly said that it is basic NPBL policy for a supervisor to investigate whenever an incident comes to his attention, even if no injury claim has been made by the employee, and that part of the reason for this is to determine whether the employee played any role in the injury. Donnelly admitted that the earliest notice NPBL received of a "formal" claim was a July 8, 2004, letter from plaintiff's counsel, which letter was admitted as plaintiff's Exh. # 1.

Donnelly testified that the PISR was prepared by T. L. Hobbs, Director of Administration at NPBL, while the memorandum at issue was prepared by plaintiff Wilson's supervisor, Leon Rodgers. Donnelly said he was not sure whether NPBL's general counsel assisted Rodgers in preparing the memorandum, but that he did not think the general counsel assisted Hobbs in preparing the PISR. Donnelly said that he understood that plaintiff Wilson reported the incident to his supervisor, Rodgers, on August 11, 2003.

At the conclusion of the evidence, plaintiff's counsel renewed its request that the Court require NPBL to place a box car at the site of the alleged incident as part of the site inspection so that plaintiff could take measurements and make observations. Plaintiff's counsel contends that Va. Sup. Ct. Rule 4:9(a) does not require any "weighing" of the hardship versus benefit in doing so and that plaintiff is entitled to have his request granted. NPBL countered that Va. Sup. Ct. Rule 4:9(a) is subject to the requirement that inspection and testing must fall within the scope of Va. Sup. Ct. Rule 4:1(b) and that it would be onerous to require NPBL to place the box car on the tracks as part of plaintiff's inspection.

Plaintiff also renewed his request that the Court require NPBL to produce the PISR and the memorandum prepared by NPBL employees after the accident. Plaintiff argued that NPBL must make a threshold showing that these documents were prepared in anticipation of litigation and that no such showing had been made since no "claim" had been filed by plaintiff at the time the PISR and the memorandum were prepared. Plaintiff noted that the NPBL rule book requires employees to report any injury to NPBL or be subject to possible dismissal. Plaintiff argued that, while he must make NPBL aware of any potential claim, the mere existence of such a potential claim is not enough to trigger the protections in Va. Sup. Ct. Rule 4:1(b)(3). NPBL responded that the Court should adopt the "reasonable foreseeability" test set out in *Smith v. National Railroad Passenger Corp.*, 22 Va. Cir. 348, 351 (Richmond 1991). NPBL asserts that under that test, the trial preparation/work product protections of Va. Sup. Ct. Rule 4:1(b)(3) do apply to the subject documents and the plaintiff is therefore required to show substantial need and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. NPBL argued that the substantial equivalent has been provided already and that plaintiff has the substantial equivalent of any statements in the documents that were obtained from plaintiff since he should know what he said. NPBL asserts that it has already "identified" all oral statements made by plaintiff in answer to plaintiff's interrogatory number five, though it has not produced the PISR or memorandum containing paraphrases of such statements. NPBL concluded that, therefore, the only thing plaintiff gains by having these documents is to know what information NPBL thinks is important because it chose to record certain information in a certain form.

## II. Discussion

The Court must address both the "work product" issue and the entry and inspection issue and will do so in that order.

### A. Work Product/Trial Preparation

Va. Sup. Ct. Rule 4:9(b) provides that a party submitting a request for production may move for an order under Va. Sup. Ct. Rule 4:12(a) compelling discovery. Where a party objects to a request for production, the standard for evaluating such objection is the same as though the objecting party had moved for a protective order under Va. Sup. Ct. Rule 4:1(c). Kent Sinclair and Leigh B. Middleditch, Jr., *Virginia Civil Procedure*, §12.11[E] (4th ed. 2003). Va. Sup. Ct. Rule 4:1(c) provides that, in such a situation, the Court "may make any order

which justice requires. . . ." The Virginia Supreme Court has said that in making this determination, the decision to grant or deny discovery rests soundly in the discretion of the trial court. *Rakes v. Fulcher*, 210 Va. 542, 546, 172 S.E.2d 751, 755 (1970). The burden to show the work product doctrine applies rests upon the party asserting the work product/trial preparation privilege. *McDonald v. Sentara Medical Group*, 64 Va. Cir. 30, 35 (Norfolk 2004). If it is determined that the work product/trial preparation privilege applies, the materials are discoverable if: (1) they are relevant to the subject matter of the litigation, (2) the requesting party can show substantial need of them, and (3) their substantial equivalent cannot be obtained without undue hardship. *Lopez v. Woolever*, 62 Va. Cir. 198, 205 (Fairfax 2003). The burden of overcoming work product protection, by proving such substantial need and undue hardship, is on the party seeking the materials. *Id.* Therefore, the Court must first decide whether either or both of the two documents at issue are privileged under the work product/trial preparation doctrine embodied in Va. Sup. Ct. Rule 4:1(b)(3). If the qualified privilege applies to either or both documents, the Court must then determine whether the plaintiff has demonstrated sufficient need for them such that he is entitled to receive the document(s) in discovery notwithstanding their privileged status.

### 1. *Historical Development*

We begin our examination of this issue with the development of the "work product" doctrine. Even before the United States Supreme Court decided *Hickman v. Taylor*, 329 U.S. 495, 511, 67 S. Ct. 385, 393, 91 L. Ed. 451, 462 (1947), and recognized the existence of a work product doctrine, such a doctrine had been developing slowly in response to changes imposed on the common law practice of discovery. Jeff A. Anderson, Gena E. Cadieux, George E. Hays, Michael B. Hingerty, and Richard J. Kaplan, "Special Project: The Work Product Doctrine," 68 *Cornell L. Rev.* 760, 764-66 (1983). As explained below, the work product doctrine recognized in *Hickman* was later codified in the Federal Rules of Civil Procedure at Fed. R. Civ. P. 26(b)(3), followed by codification in the Rules of the Supreme Court of Virginia at Va. Sup. Ct. Rule 4:1(b)(3).

In order to understand the current work product doctrine, it is helpful to consider its origins in a bit more detail. In the *Cornell Law Review* article cited above, the authors review the history of the doctrine, noting that:

> During the last half of the nineteenth century, when liberal discovery procedures were developing in England, the courts expanded professional privilege to include not only

communications between attorney and client, but also materials prepared for trial, whether by the solicitor, his agents, or his client. Although this approach influenced some American state courts, it had no impact on the federal courts, which had not yet embraced liberal discovery.

The adoption in 1937 of the Federal Rules of Civil Procedure initiated a slow revolution in attitude toward pretrial discovery that led to the development of a work product doctrine in the United States. The merger of law and equity and the simplification of pleadings under the Federal Rules greatly expanded the role of discovery. Prior to the enactment of the Federal Rules, the pleadings had served to formulate issues and develop facts. Under the Federal Rules, discovery, not pleading, became the primary means of performing these tasks. To accomplish this, the discovery rules included an array of devices unknown to common law. As complete as this discovery scheme was, however, it did not include a mechanism for resolving conflicts similar to those addressed by the attorney-client privilege in evidentiary matters.

Anderson et al., *supra* at 766-67 (footnotes omitted).

Expansion of discovery by codified rules of procedure created tension between an attorney's obligation to his client and his duty to respond to discovery requests. Courts developed the work product doctrine, in part, to ease the tension inherent in such a situation. *Id.* Because an attorney's case was largely immune from discovery in American courts prior to the adoption of discovery rules, an attorney had no need for such a protective doctrine. *Id.* After the discovery provisions of the Federal Rules of Civil Procedure were adopted, courts did not take a uniform view as to how trial preparation materials should be treated. *Id.* The split in the courts over the appropriate protection to be afforded trial preparation material led the Advisory Committee on the Federal Rules of Civil Procedure to suggest changes in the Rules. Amidst apparent dispute, the Supreme Court chose not to adopt the rule proposed in the Advisory Committee's 1946 recommendation, opting instead to articulate the standard for protection of work product in the then-pending *Hickman* decision. *Id.*

In *Hickman*, a tug boat sank on February 7, 1943, while towing a barge. Several crew members were killed. *Hickman*, 392 U.S. at 497, 67 S. Ct. at 387, 91 L. Ed. at 455. The tug owners and their underwriters employed a law firm, three days later, to defend them against potential suits. The attorney representing

the tug boat owners interviewed the survivors and took their statements, such statements being signed on March 29, 1943. When these statements were taken, two of the deceased crewmen's representatives had been in touch with the attorney for the tug owner. Shortly before the statements were taken, a public hearing was held by the United States Steamboat Inspectors, on March 4, 1943. Suit was filed on behalf of one of the deceased crewmen. During pre-trial discovery, plaintiff propounded an interrogatory requesting any statements made by any crewman of the tug regarding the incident. The Supreme Court upheld the refusal of the tug owners' attorney to produce the statements. It did so based upon two primary considerations. In a thorough summary of those considerations, a law review article written by Todd Benson, Esq., notes as follows:

> First, the Court sought to protect the mental impressions and mental processes of the attorney. The Court found that it is essential that an attorney be able to prepare his legal theories and plan his strategies without undue and needless interference. The Court also noted that an attorney's thoughts are reflected in "interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways." Collectively, the Court referred to these items as "work product." The Court went on to note that: "[W]ere such materials open to an opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be . . . his own. . . . The effect on the legal profession would be demoralizing. And the interests of the client and the cause of justice would be poorly served." Although this aspect of the decision often comes to mind in consideration of the *Hickman* case, it has been suggested that the "mental process" import of the case has been diminished in light of subsequent cases on the subject.
>
> The second, and arguably dominant, policy behind *Hickman* has been described as the anti-indolence provision. The Court noted that the plaintiff sought discovery of oral and written statements of witnesses whose identities were well known to him and whose availability appeared unimpaired and that this discovery was sought as a matter of right. The Court held that such a demand could not be made without a showing of necessity for the production of this material or a demonstration

that denial of production would cause undue hardship or injustice. The mere fact that the materials were not privileged was not a sufficient reason to compel production.

In a concurring opinion, Justice Jackson addressed *Hickman's* argument that the Federal Rules of Civil Procedure were designed "to do away with the old situation where a lawsuit developed into a battle of wits between counsel." Justice Jackson rejected this argument, noting that an inherent aspect of our common law system is that trials proceed on an adversarial basis. Indeed, the Justice noted that free and open discovery of work product materials without any showing of substantial need "puts trials on a level even lower than 'a battle of wits'."

W. T. Benson, "Corporation and Institutional Accident Investigations as Work Product Pursuant to the Rules of the Supreme Court of Virginia," 17 *U. Rich. L. Rev.* 285, 286-89 (1983).

The *Hickman* decision resulted in conflicting decisions on discovery work product issues in the federal trial courts. By 1953, the Advisory Committee on the Federal Rules of Civil Procedure proposed changes to address these conflicting decisions, but those changes were rejected. Anderson et al., *supra* at 780-82. Later, in 1970, extensive amendments to the Federal Rules focused on the problem of what "good cause" under Fed. R. Civ. P. 34 was necessary to permit discovery of an opposing party's documents, as well as the question of what degree of protection should be afforded to the work product of non-attorneys. *Id.* at 783.[6] Instead of leaving the question of *Hickman's* relevance to the Advisory Committee's notes, "a new rule 26(b)(3) purported to codify *Hickman*, and to describe the showing *Hickman* required for discovery of trial preparation materials." *Id.* (footnotes omitted). In doing so, the "good cause" language was removed from Fed. R. Civ. P. 34, and "[a]part from trial preparation materials, discovery requests no longer required a showing beyond that of relevance and absence of privilege." Benson, *supra*, p. 290. Correspondingly, the "good cause" requirement previously applied to discovery requests for trial preparation material would now be addressed in Fed. R. Civ. P. 26(b)(3).

---

[6] Rule 34 of the then-existing Federal Rules of Civil Procedure required a showing of "good cause" for the production of all documents and things whether or not trial preparation was involved. Benson, *supra*, p. 289. By 1970, it was obvious that federal courts were applying two different "good cause" tests, one test regarding those documents not prepared with an eye toward litigation (generally requiring mere relevance) and another test for trial preparation materials (generally requiring more than mere relevance). Benson, *supra*, pp. 289-90.

Fed. R. Civ. P. 26(b)(3) and Va. Sup. Ct. Rule 4:1(b)(3) are identical (other than gender references), and the Virginia rule provides that "[u]nless otherwise limited by order of the court in accordance with these Rules, the scope of discovery is as follows:

> (3) *Trial Preparation Materials.* Subject to the provisions of subdivision (b)(4) of this Rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this Rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.
>
> A party may obtain without the required showing a statement concerning the action or its subject matter previously made by that party. Upon request, a person not a party may obtain without the required showing a statement concerning the action or its subject matter previously made by that person. If the request is refused, the person may move for a court order. The provisions of Rule 4:12(a)(4) apply to the award of expenses incurred in relation to the motion. For purposes of this paragraph, a statement previously made is (A) a written statement signed or otherwise adopted or approved by the person making it, or (B) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement by the person making it and contemporaneously recorded.

The adoption of this rule "settled the other major post-*Hickman* problem by unequivocally extending work product immunity to non attorneys engaged in trial preparation." *Id.* The new rule applied only to "tangible" work product,

while *Hickman* protected intangible work product. Anderson et al., *supra*, at 763.[7] Furthermore, while *Hickman* "created a flexible immunity for trial preparation materials bounded only by its policies," . . . "Rule 26(b)(3), by preempting a large part of the doctrine's coverage as developed in *Hickman* and subsequent case law, limited the importance of policy analysis in determining the perimeters of the immunity." *Id.* (footnote omitted). However, "[u]nderstanding the interplay between the rule and the underlying policies can . . . help resolve those difficult cases in which the language of the rule is susceptible to more than one reading." *Id.* at 784. Of course, since the rule does not encompass the entire work product doctrine, an understanding of its policies is also important in order to resolve such non-rule disputes.

As noted above, the primary justification for the doctrine is that it preserves the privacy of preparation that is essential to the attorney's adversary role. *Id.* at 785. Since each party has responsibility for presenting its own arguments, the adversary system fosters a competitive relationship that motivates each party to marshal all the law and facts beneficial to its case. *Id.* Since open discovery might have a tendency, in some cases, to deter an attorney from conducting thorough factual investigation, thus dulling the competitive relationship that encourages attorneys to develop legal theories and facts, the work product doctrine acts to revitalize the competitive relationship by creating a zone of privacy within which the attorney or investigator may work relatively free of the fear that his efforts will be discoverable. *Id.* This zone of privacy also removes disincentives to thorough preparation. Since some attorneys may hope to take advantage of their opponent's diligence without conducting their own investigation, there may develop a lack of commitment to independent investigation where no work product protection exists. *Id.* at 786. The absence of a work product doctrine might encourage laziness and a "wait and see" attitude. Such an attitude may produce a corresponding disincentive by the opponent to thoroughly investigate and prepare. *Id.* Still other attorneys and investigators may, as a result of open discovery, devoid of work product protection, choose not to

---

[7] The work product doctrine announced in *Hickman* was not limited to documents. Since Fed. R. Civ. P. 26(b)(3) and Va. Sup. Ct. Rule 4:1(b)(3) are limited by their terms to the discovery of documents and tangible things, they leave the *Hickman* work product doctrine applicable to everything other than documents and tangible things. Thus, when discovery of "work product" is sought through interrogatories or through questions propounded at the taking of deposition, the Rule has no application and one must revert to the principles enunciated in *Hickman*. Richard H. Field, Benjamin Kaplan, Kevin M. Clermont, *Civil Procedure, Materials for a Basic Course*, 8th ed. 2003 (citing *Moore's Federal Practice*, § 26.64[4]).

keep accurate records or conduct a thorough investigation for fear of their production in discovery. Such a result creates an inefficiency in the trial process. *Id.*

A secondary rationale emphasizes the need to protect the privacy of the attorney's mental processes. *Id.* The revelation in discovery of a document reflects, to some extent, the decisions of its preparer. The investigator or attorney may have, for whatever reason, interviewed only certain witnesses and taken certain actions. Such information reflects decisions of the investigator and/or the attorney as to what information is important. For the same reasons reviewed above, the adversary system benefits from protecting the information that reflects those decisions.

### 2. *Application of Work Product Doctrine in Virginia*

The rules of pre-trial discovery are contained in Part Four of the Rules of the Supreme Court of Virginia. Such rules are basically Fed. R. Civ. P. 26 to 37. The purpose of copying these federal rules "is to enable Virginia lawyers and circuit court judges to use federal precedents to guide Virginia practice in the field of discovery." W. Hamilton Bryson, *Virginia Civil Procedure*, p. 327 (3d ed. 1997); *see Brown v. Black*, 260 Va. 305, 311, 534 S.E.2d 727, 730 (2000) (federal court interpretation of its rules identical to Virginia rules is informative for Virginia courts though not binding).[8]

While the Virginia Supreme Court has not addressed the exact issue before the Court, it has noted that the work product doctrine "protects an attorney from opening his files for inspection by an opposing attorney" and recognized that the privilege extends to statements taken by third-persons for the use of trial counsel. *Rakes*, 210 Va. at 546-47, 172 S.E.2d at 755-56. The Court has also held that material such as interviews, statements, memoranda, correspondence, briefs, mental impressions, and personal beliefs which are prepared by an adversary's counsel with an eye towards litigation may be free from discovery under the attorney work product doctrine. *Commonwealth v. Edwards*, 235 Va. 499, 510, 370 S.E.2d 296, 302 (1988). The circuit courts that have addressed the application of the work product doctrine to documents such as those before this Court have produced an array of positions, some of which the Court will address below.

---

[8] Thirty-three other states have adopted verbatim copies of Fed. R. Civ. P. 26(b)(3). Wright, Miller & Marcus, *Federal Practice and Procedure: Civil 2d*, § 2023.

Plaintiff asserts one of the positions adopted by some Virginia circuit courts and contends that the items at issue were prepared *before* any claim was filed and that, therefore, no work product protection applies to the documents. This argument was thoroughly addressed, in a discussion of the varied approaches courts have adopted, in the respected federal civil procedure treatise *Moore's Federal Practice*, as follows:

> Courts have devised various formulations regarding just how concrete the prospect of litigation must be before protection will attach to a given document. For example, some courts require "more than a remote possibility of litigation" when the document is prepared. Others state that there must be "an identifiable prospect of litigation," and require that specific claims must have already arisen when the document is prepared. Still others require that at the time the document is created, the party or its representative must have in mind a "specific claim supported by concrete facts which would likely lead to litigation." Some courts require that the *primary* motivating purpose behind the creation of the document be to aid in possible litigation. . . .
>
> The Second Circuit has adopted the "because of" approach to determining whether a document was prepared "in anticipation of litigation." Under this approach, a document is entitled to work product protection if it is prepared "because of" existing or expected litigation. The "because of" approach is more inclusive than the approach taken by those courts that require a document to be prepared "primarily or exclusively to assist in litigation.". . .
>
> The "because of" approach adopted by the Second Circuit is the more persuasive view. Regular course of business and in anticipation of litigation are not always mutually exclusive and dichotomous fields. Many business decisions are made in anticipation of the inevitable litigation. The "because of" inquiry offers a more administrable standard, effectively resolving uncertainty at the margins in favor of work product protection. At the same time, protection is not unduly expanded if the document would not have been produced but for the anticipated suit. Evaluating the risks of litigation that a business plan will face is often integral to the plan and is in this sense generated in the course of business. There is no persuasive reason to deny work product protection because the document has these marks of business purpose, if it was prepared because of the anticipated litigation.

*Moore's Federal Practice*, § 26.70[3][a].

This Court agrees that the "because of" approach, to determining whether a document was prepared in anticipation of litigation, is the more persuasive view. However, that does not end the inquiry, since a court must still look to some method of deciding whether a document was prepared "because of" anticipated litigation. The specific application of the "because of" approach to production of investigative reports was also addressed in Moore's Federal Practice. While some different considerations apply when work product is addressed in the context of an insurance adjuster's documents, the analysis of some of those considerations in the insurance context is transferable to the current·discussion of in-house investigative documents. The discussion in *Moore's Federal Practice* of insurance claims adjuster's reports is therefore also helpful in analyzing application of the work product privilege to the kind of in-house investigative reports and memoranda at issue here. *Moore's Federal Practice* notes that:

> Claims adjusters' reports made in connection with accident claims by third parties have generated a good deal of disagreement in the courts. The earliest decisions under Rule 26(b)(3), referred to as the *Thomas Organ* line of cases, took the view that, with respect to third party claims, a claims adjuster's report was conclusively presumed to have been made in the regular course of the insurer's business, and not in anticipation of litigation, unless the report had been requested by or for an attorney. Subsequent cases have properly rejected the *Thomas Organ* holding as contrary to the express language of the work product rule. . . .
>
> The cases disagreeing with *Thomas Organ* have adopted two different approaches. Some courts have reached a completely opposite conclusion from *Thomas Organ* and have held that any documents prepared by an insurer in response to a third party accident claim are prepared in anticipation of litigation. Others courts, reasoning that Rule 26(b)(3) was not intended to automatically insulate insurance claims files from discovery, have adopted a case-by-case approach regarding third party claims that, while not requiring the participation of an attorney for work product protection, still requires the insurer to meet the burden of proof requirement of the Rule. . . .

In the case-by-case approach, the involvement of an attorney, while not dispositive of the "anticipation of litigation" issue, is a highly relevant factor. The involvement of an attorney makes it more likely than not that the focus has shifted toward litigation, making materials more likely to have been prepared in anticipation of litigation. Similarly, under the case-by-case approach, the nature of the claim may be a dispositive factor in determining whether documents were prepared in anticipation of litigation. . . .

The case-by-case approach to third party claim situations appears to be the soundest compromise between Rule 26's overall purpose of encouraging free and open discovery and subsection (b)(3)'s specific purpose of protecting a party's litigation strategy and thought processes.

*Moore's Federal Practice*, § 26.70[3][c][i]. This Court agrees that a case-by-case approach is more sound than the *Thomas Organ* approach, and it is more sound than the approach holding that any document prepared after an accident is automatically covered by the work product privilege. Adopting a case-by-case approach permits the Court to analyze the applicable factors in the context of each individual case. Such an examination should be encouraged since it promotes the policies behind the work product doctrine. Adoption of a bright line rule, on the other hand, results in a potentially arbitrary application of the work product doctrine. Several other Virginia circuit courts have adopted this case-by-case approach in varying degrees. *See Lopez v. Woolever*, 62 Va. Cir. 198, 203 (Fairfax County 2003) (rejecting a bright-line rule and adopting a case-by-case analysis in the insurance context); *Larson v. McGuire*, 42 Va. Cir. 40, 45 (Loudoun County 1997) (implicitly adopting a case-by-case analysis in the insurance context). Numerous federal courts have adopted the case-by-case approach in determining whether documents were prepared in anticipation of litigation such that the work product doctrine applied. *Chambers v. Allstate Ins. Co.*, 206 F.R.D. 579, 588 (S.D. W. Va. 2002); *S. D. Warren Co. v. Eastern Elec. Corp.*, 201 F.R.D. 280, 283 (D. Me. 2001); *Suggs v. Whitaker*, 152 F.R.D. 501, 506-07 (M.D. N.C. 1993); *Basinger v. Glacier Carriers, Inc.*, 107 F.R.D. 771, 773-74 (M.D. Pa. 1985); *State Farm Fire & Casualty Co. v. Perrigan*, 102 F.R.D. 235, 238 (W.D. Va. 1984).

Applying this case-by-case approach, the Court must determine whether the two documents at issue were prepared "because of" the accident. The Benson law review article cited above argues persuasively that "the applicable test as to what constitutes materials prepared 'in anticipation of litigation' should be a reasonable man test" such that if "a reasonable man, in the shoes of the

party *resisting* discovery when the requested material was produced, would have anticipated or reasonably foreseen litigation, the subject matter should receive the qualified protection of Rule 4:1(b)(3)." Benson, *supra* at p. 295; *Smith*, 22 Va. Cir. at 351. Doing so is consistent with the plain language of the Rule and with the considerations espoused in *Hickman*. *Id*. Therefore, if a reasonable person in the shoes of NPBL, at the time these documents were produced, would have anticipated or reasonably foreseen litigation, it can be said that such documents were prepared because of anticipated litigation, and therefore in anticipation of litigation, and are entitled to the qualified work product/trial preparation privilege of Va. Sup. Ct. Rule 4:1(b)(3).

### a. *Memorandum*

The Court has conducted an *in camera* inspection of the memorandum at issue. This memorandum was prepared by plaintiff's supervisor, was begun on the day of the incident (August 11, 2003), and concludes several days after the incident (August 18, 2003). Applying the case-by-case analysis discussed above, the Court finds the following facts relevant to its analysis.

First, the plaintiff reported this incident to NPBL on the day that it took place. NPBL responded immediately by inspecting the pole referenced by plaintiff and having it straightened. In determining whether NPBL could have reasonably foreseen litigation when the memorandum was prepared, the Court considers the fact that NPBL was aware of an alleged incident and possible injury and apparently confirmed the condition of the alleged injury mechanism, a fence post or pole leaning toward the railroad tracks. Such knowledge of an incident, along with facts tending to corroborate the report of the incident (the pole was apparently leaning toward the tracks upon inspection after the incident), create the predicate for NPBL to reasonably foresee litigation.

Second, NPBL's Vice President testified that, because of the unique liability scheme of the FELA,[9] and because 95% of all incident reports to NPBL

---

[9] In order to prevail on an FELA claim, a plaintiff's proof must justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury for which damages are sought. *Norfolk & Western Ry. v. Johnson*, 251 Va. 37, 43, 465 S.E.2d 800, 805 (1996). Contributory negligence is not a defense in FELA cases, though it does mitigate damages. *Chesapeake & O. Ry. v. Richmond*, 217 Va. 258, 261, 227 S.E.2d 707, 710 (1976). Assumption of the risk has been abolished in FELA cases. *Id*. This means that in FELA cases, a plaintiff need not prove that the defendant's breach was the proximate cause of the plaintiff's injury, merely that it played any part, no matter how slight. *Hatfield v. Norfolk & Western Ry.*, 46 Va. Cir. 494, 499 (1995). Under the FELA, a railroad has a nondelegable duty, which is continuing, to exercise reasonable care in furnishing its employees a safe place to work. *Norfolk and Western Railway Co.*, 251 Va. at 44, 465 S.E.2d at 805. The FELA requires that a railroad

result in claims, it was company policy for supervisors of injured workers to prepare such memoranda when any incident occurs. The knowledge that 95% of all incident reports result in claims, combined with the unique negligence standard and law that applies to FELA claims, also tends to create a basis for NPBL to reasonably foresee litigation. NPBL's argument that it reasonably foresaw litigation from the moment it learned of the incident is reinforced by Donnelly's testimony that, when he learned of plaintiff's incident, he assumed, based in part on the fact that plaintiff was a union official, that plaintiff would file a claim.

Third, NPBL's Vice President, Donnelly, testified that on the morning plaintiff's injury came to his attention as a result of the "morning report," which was within a day or so of the incident itself, he followed his normal practice involving employee injuries and telephoned NPBL's General Counsel. The fact that NPBL normally telephoned its General Counsel when it learned of any injury incident supports its contention that other activities such as preparing the memorandum are done with an eye toward litigation. Furthermore, with reference to this specific case, the fact that NPBL telephoned its attorney when this incident came to its attention, within a day or so of the incident, also suggests that the various entries on the memorandum were placed there based upon NPBL reasonably foreseeing litigation.

Fourth, NPBL produced in discovery the Personal Injury Report (PIR) form that it prepared on plaintiff's incident, as well as the "reportable condition" form prepared immediately after the incident. Donnelly testified that those documents are not prepared in anticipation of future litigation. NPBL therefore suggests that some of the documents it prepared immediately after the incident were prepared in an effort to plan for possible litigation, while other documents prepared immediately after the incident were not prepared in an effort to plan for possible litigation. The fact that basic incident information was recorded on documents that were prepared ostensibly in the ordinary course of business tends to suggest that other documents with duplicative information might have another purpose, such as litigation preparation.

Fifth, plaintiff had not filed a formal claim with NPBL at the time the memorandum entries were recorded. While factors one through four above suggest that NPBL reasonably foresaw litigation when it learned of plaintiff's

perform proper inspections to discover dangers in the place where employees are required to work and, after determining the existence of dangers, the employer must take reasonable precautions for the employee's safety. *Id.* Therefore, the FELA differs significantly from the common law negligence scheme applicable to tort claims in Virginia and reflects some of the considerations applicable to the workers= compensation scheme covering other employee injuries in Virginia.

incident and began the memorandum entries, plaintiff suggests that the Court should establish a bright-line at the moment that a formal claim is filed such that the work product privilege would not apply to such pre-claim documents. For the same reasons that this Court declines to adopt a bright-line rule granting work product protection to all documents prepared after the moment of a railroad incident, the Court also declines to adopt a bright-line rule refusing work product protection to all documents prepared before receipt of a formal claim and granting protection to documents prepared after receipt of a formal claim. *Larson*, 42 Va. Cir. at 45 (rejecting application of such bright-line tests). Such arbitrary bright-line rules fail to consider the myriad of factors that must be considered in a case-by-case analysis. While it is true that the absence of a formal claim in this matter is *one* factor to be considered, the other factors reviewed above outweigh the absence of a formal claim at the time the entries were made on the memorandum.

For these reasons, the Court finds that a reasonable person in the shoes of NPBL, at the time the memorandum was produced, would have anticipated or reasonably foreseen litigation. Therefore, the court concludes that, based upon the evidence presented in this matter, the memorandum was produced because of expected litigation and is entitled to the qualified work product privilege of Va. Sup. Ct. Rule 4:1(b)(3). *Smith*, 22 Va. Cir. at 353; *Gargano v. Metro-North*, 222 F.R.D. 38, 40 (D. Conn. 2004); *Ex parte Norfolk Southern Ry.*, 897 So. 2d 290, 294-95 (Ala. 2004); *Florida East Coast Ry.*, 847 So. 2d 1118, 1119 (Fla. App. 2003); *Eoppolo v. National Railroad Passenger Corp.*, 108 F.R.D. 292, 294 (E.D. Pa. 1985).

Having determined that the qualified privilege applies, and because the memorandum would clearly be relevant if not privileged, *Lopez*, 62 Va. Cir. at 205, the Court must now determine whether plaintiff has shown he has "substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Plaintiff came to the Court with a heavy burden in this regard because, at the time of the hearings on this motion, he had not yet taken the deposition of Leon Rodgers, who made the entries on the memorandum, or of any others with knowledge of this incident. *See Florida East Coast Ry. v. Jones*, 847 So. 2d 1118 (Fla. Dist. Ct. App. 2003) (noting the absence of a showing of the extent of plaintiff's diligence in seeking information by other means). During oral argument on this motion, NPBL's counsel indicated that it had answered plaintiff's interrogatory number five and "identified" all statements made by plaintiff so that plaintiff's counsel could follow up. That interrogatory answer indicates specific dates on which plaintiff verbally reported certain information to NPBL and provides the substance of

those reports by plaintiff. Therefore, with this information having been provided and with no further showing from plaintiff of substantial need, the Court finds that plaintiff has not shown substantial need of the memorandum in the preparation of his case, and he has not shown he is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

### b. *Personal Injury Summary Report (PISR)*

The Court has also conducted an *in camera* inspection of the Personal Injury Summary Report (PISR). The PISR was prepared on October 31, 2003, by T. L. Hobbs, Director of Administration for NPBL. The PISR contains information about the injury, its location, and medical treatment. Donnelly testified that a Personal Injury Report (PIR) was filed by plaintiff on August 19, 2003. Donnelly further testified that, pursuant to FRA regulation, NPBL reported the injury to the FRA on August 23, 2003, and this is corroborated by the notations at the top of the PIR submitted as NPBL Exh. # 1 at the September 6, 2005, hearing. As noted above, the earliest notice NPBL received of a formal claim by plaintiff was a July 8, 2004, letter from plaintiff's counsel admitted as plaintiff's Exh. # 1. Applying the case-by-case analysis discussed above, the Court finds the following facts relevant to its analysis.

First, the PISR was prepared over two months after the memorandum. The memorandum, for the reasons stated above, is privileged from discovery based upon the work product doctrine. Therefore, unless the PISR is substantively different from the memorandum, there is no reason why it should not be entitled to the qualified work product privilege since it was prepared over two months after NPBL reasonably foresaw litigation. In addition, the information contained in the PISR was prepared at a time long after the memorandum. Therefore, the argument for privilege is even stronger than it was for the memorandum. By October 31, 2003, plaintiff had filed his own Personal Injury Report (PIR) and NPBL had reported the injury to the FRA. By October 31, 2003, NPBL could have reasonably foreseen litigation, having knowledge of the incident, the leaning pole, the plaintiff's PIR, and his medical treatment.

The Court observes that the fact that the information which NPBL seeks to protect from discovery is contained in a pre-printed form does not necessarily preclude its treatment as work product. The relevant inquiry is whether NPBL reasonably foresaw litigation at the time the document was prepared and whether it contains such work product, not the manner in which the information is configured.

Second, NPBL's policy was to treat such incidents as if they would lead to litigation because 95% of all incident reports resulted in claims. Third, NPBL had spoken to its attorney about this incident before October 31, 2003. Fourth,

NPBL had produced other documents with business purpose incident information in them, the PIR and the reportable condition form. Therefore, as noted above, the fact that basic incident information was recorded on documents that were prepared ostensibly in the ordinary course of business tends to suggest that other documents with duplicative information might have another purpose and corroborates NPBL's statement that it anticipated litigation when the PISR was prepared. Finally, while no formal claim had been filed on October 31, 2003, as noted above, the rest of the evidence outweighs any suggestion that the absence of such a claim should preclude NPBL from anticipating litigation.

Accordingly, the Court finds that the PISR is qualifiedly privileged under the work product doctrine. Because such a document is clearly "relevant," the next question is whether plaintiff has shown substantial need for the document. For the same reasons articulated above in finding no such showing for the memorandum, the Court also finds that plaintiff has not made a showing of substantial need for the PISR.

## B. *Entry and Inspection*

Plaintiff requests that the Court order NPBL to place a rail car at the location where he was injured "to allow accurate measurements to be taken with respect to the clearance distances between Track # 3 and the fence adjacent thereto." Plaintiff indicated that an agreement had been reached with Norfolk Southern Corporation, the owner of the property where such rail car would be placed, for entry on to that land. NPBL responded that it should not be required to place rail cars at the incident site, on Norfolk Southern Corporation's property, for purposes of measurements because the fence post was repositioned shortly after the incident was reported by plaintiff on August 11, 2003. NPBL further contends that the considerable burden, inconvenience, and expense of such a placement procedure far outweighs any possible benefit to plaintiff.

NPBL presented considerable testimony (reviewed above) regarding the challenges it would incur if required to place a rail car at the location of the incident. Among those challenges, NPBL's Vice President, Mr. Donnelly, noted that Norfolk Southern Corporation owns the rail cars used at the Ford Plant and NPBL leases the locomotives used to move those cars. The cost for leasing such locomotives is $300.00 per day, exclusive of fuel and crew costs. Donnelly testified at length regarding the "just in time delivery" method by which rail cars arrive at the Ford Plant, as well as the possibility of disruption if NPBL were required to place a rail car at the incident site for inspection and measuring. Donnelly also testified that, in addition to the cost of leasing a

locomotive and the need to obtain a rail car from Norfolk Southern Corporation, NPBL would also have to pay a crew to place the car there with a locomotive and then to remove the car. Additionally, Donnelly said that it would be necessary to "blue flag" the track where such inspection and measurement were taking place, essentially shutting down the tracks utilized for such placement and inspection, as well as adjacent tracks.

Rule 4:9(a) of the Rules of the Virginia Supreme Court provide that "[a]ny party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on his behalf . . . to inspect . . . . any tangible things which constitute or contain matters within the scope of Rule 4:1(b) and which are in the possession, custody, or control of the party upon whom the request is served." While NPBL originally argued that it did not have possession or control of the property, such argument need not be addressed now that Norfolk Southern Corporation has given permission for entry on the property. However, the Court must still decide whether plaintiff has the right to require NPBL to place a rail car (which it has in its possession at the time) on the tracks at the Norfolk Southern Corporation property.

Va. Sup. Ct. Rule 4:9(b) provides that, where there is objection to an inspection request, the party making such request may move for an order under Va. Sup. Ct. Rule 4:12(a) with respect to such objection. The Court's standard in evaluating any objection by a party to a requested inspection is the same as though the party had sought a protective order under Va. Sup. Ct. Rule 4:1(c). Sinclair & Middleditch, *supra* at § 12.11[E]. Furthermore, Va. Sup. Ct. Rule 4:1(c) provides that the court may make any order which justice requires and such decision rests squarely in the discretion of the trial court. *Rakes*, 210 Va. at 546, 172 S.E.2d at 755.

It appears to this Court that any obligation on NPBL's part to place a rail car on the tracks at the Norfolk Southern Corporation must flow from plaintiff's right to "inspect" a "tangible thing" in the possession or control of NPBL.[10] In determining whether to require NPBL to produce a rail car[11] for inspection *at the Norfolk Southern location by the Ford Plant*, the Court first notes that the right of a party under Rule 4:9 to enter upon designated land and inspect an operation thereon is not unlimited and that the Rule specifically

---

[10] It should be noted that plaintiff has not requested that NPBL produce for inspection the rail car at issue B ostensibly because plaintiff does not allege that a specific part of this rail car malfunctioned and somehow contributed to his injury. *See Cooley v. Union Pacific RR.*, Cause No. BDV-2003-732, 2005 Mont. Dist. LEXIS 799 (Lewis and Clark County August 3, 2005).

[11] Plaintiff has apparently determined that any rail car that would be produced by NPBL would be of the same width as the one on which he was riding at the time of the injury he alleges.

states that such discovery must fall within the scope of Va. Sup. Ct. Rule 4:1(b). *See Long v. United States Brass Corp.*, CCH Prod. Liab. Rep. P17,076, 2004 U.S. Dist. LEXIS 14762, *8 (D. Colo. 2004) (construing the virtually identical language in Fed. R. Civ. P. 34). Rule 4:1(b) of the Rules of the Virginia Supreme Court limits discovery under Va. Sup. Ct. Rule 4:9(a) to those matters, not privileged, which are relevant to the subject matter involved in the case, and that information that appears reasonably calculated to lead to the discovery of admissible evidence. Furthermore, pursuant to the standard set forth above for determining what "justice requires," Va. Sup. Ct. Rule 4:1(c) directs that a court may, for good cause shown, enter an order preventing discovery where necessary to protect a party from annoyance, embarrassment, oppression, or undue burden or expense. *Id.* at *8-9; *see Belcher v. Bassett Furniture Indus., Inc.*, 588 F.2d 904, 908 (4th Cir. 1978) (where entry on land is sought, "the degree to which the proposed inspection will aid in the search for truth must be balanced against the burdens and dangers created by the inspection"); *Johnson v. Mundy Industrial Contractors, Inc.*, 52 Fed. R. Serv. 3d (Callaghan) 511, 2002 U.S. Dist. LEXIS 19346, *7 (E.D. N.C. 2002) (requests for inspection of land require balancing need versus "burdens and dangers created by the inspection").

While plaintiff's request for NPBL to place a rail car at the incident site is not a pure request to enter land under Va. Sup. Ct. Rule 4:9(a)(3) nor a pure request to inspect a tangible thing under Va. Sup. Ct. Rule 4:9(a)(1), this Court believes that such a request should be subject to the same standard applied to requests for entry on land. Therefore, in reviewing plaintiff's request for NPBL to place a rail car at the incident scene, the degree to which the proposed inspection will aid in the search for truth must be balanced against the burdens and danger created by such inspection.

Turning to the facts of this case, NPBL presented evidence indicating that Norfolk Southern Corporation owns the rail cars used at the Ford Plant and NPBL leases the locomotives for $300.00 per day (excluding fuel and labor) in order to move the cars. Evidence also indicated that placement of the rail car for entry and inspection may well result in an operations delay at the Ford Plant because of the potential disruption in operations from occupying the track. Furthermore, the evidence revealed that placement by NPBL and inspection of a Norfolk Southern Corporation rail car by plaintiff, plaintiff's counsel, photographer, and expert would create safety issues because nearby tracks would have to be closed.

A somewhat similar request was considered in *In re Air Crash Disaster at Sioux City, Iowa*, Master File No. MDL-817 No. 89 C 8082, 1991 U.S. Dist. LEXIS 10372, *3-*7 (N.D. Ill. 1991). In that case, plaintiffs sought to

create a videotape depiction of the sequence of events experienced by the passengers on board an aircraft during the forty-four minutes between loss of the number two engine and the subsequent descent and ultimate crash. *Id.* Plaintiffs in that case sought to require United Airlines to provide a DC 10-10 jet to re-enact the manipulation of the remaining engines and asked United Airlines to provide a non-revenue training or post-maintenance flight for such purpose. United Airlines rejected the request, citing various reasons. Plaintiffs then sought documents to test the veracity of those reasons. Ultimately, the Court observed that such information was only relevant and discoverable if the court first determined that plaintiffs could use a United DC 10-10 aircraft. *Id.* The *Air Crash Disaster* Court stated that plaintiffs "essentially request that United supply its own flight crew and aircraft to carry out in-flight tests devised by plaintiffs." *Id.* The *Air Crash Disaster* Court concluded that such a request "is unduly burdensome and may indeed prove dangerous." Furthermore, the Court observed that Rule 34, the equivalent of Va. Sup. Ct. Rule 4:9(a), "does not require a party to conduct tests on machinery according to the opposing party's specification."

While the Court has found no case directly on point, there are other cases involving analogous situations. In the federal civil procedure treatise entitled *Moore's Federal Practice*, the authors construe Fed. R. Civ. P. 34, the parallel federal rule to Va. Sup. Ct. Rule 4:9, and note that, while "Rule 34(a)(2) allows a party to perform various acts in connection with entry onto property, including observation, testing, and photographing . . . the Rule does not authorize a court to order one party to conduct tests requested by the other party." *Moore's Federal Practice*, § 34.15 (3d ed. 1997); *Sladen v. Girltown, Inc.*, 425 F.2d 24, 25 (7th Cir. 1970).

Plaintiff Wilson asks this Court to require NPBL to, among other things, place a rail car at the incident site, on Norfolk Southern Corporation's property, so that plaintiff, plaintiff's counsel, a photographer, and expert may enter such location to inspect, measure, survey, and photograph in the vicinity of the track with rail cars on and off such track. Nothing in the Rules of the Supreme Court of Virginia expressly requires NPBL to make available a rail car (with the required use of a locomotive to place such rail car) and railroad crew so that plaintiff may direct them to move the car to a specific location and, in effect, re-enact part of the incident alleged by plaintiff.[12] If these rail

---

[12] There is no question that in some cases it is appropriate for a plaintiff to request an order permitting entry and inspection at the site of an accident. For example, as long ago as 1946 the federal courts recognized the right of a plaintiff in a Jones Act case to inspect a vessel where

cars are of uniform width, as represented at oral argument, there is no reason that plaintiff cannot conduct measurements at the incident site to determine the distance from the tracks to the now-upright pole against which plaintiff alleges he injured his shoulder. With the knowledge of the rail car width and measurements from the tracks to the pole, the plaintiff will be able to determine the distance from the side of the rail car to the now-upright pole, as well as any nearby poles. Of course, this information still does not reveal the angle at which the pole was leaning in toward the rail car on August 11, 2003, over two years ago. Nor does such information reveal the distance between the side of the rail car and the then-leaning pole as of August 11, 2003.

It is unnecessary for this Court to reach the more fundamental issue and determine whether this Court has the authority to grant plaintiff's request and whether there are *any* circumstances where it would be appropriate for the Court to order that a rail car be placed at a particular incident location for the purpose of a partial reenactment, since, on *these* facts, any benefit from such proposed reenactment is of little or no benefit when compared to the burden and annoyance it would create. Therefore, applying the standard set out at Va. Sup. Ct. Rule 4:1(c), the Court finds that, since plaintiff's request creates an undue burden and expense because the burdens and dangers created by the inspection outweigh the degree to which the proposed inspection will aid in the search for the truth, and such request must be denied.

## *Conclusion*

For the reasons stated above, that portion of plaintiff Wilson's Request for Entry and Inspection of the accident site, which asks the Court to direct defendant NPBL to place a rail car on the tracks at the accident scene during such inspection, is denied. Pursuant to plaintiff's existing agreement with Norfolk Southern Corporation, plaintiff is of course free to conduct an inspection. Furthermore, since NPBL has not objected to allowing plaintiff to measure the width of a rail car (the same size as the one involved in this incident) and the distance from the rail wheels to the side of the car, such measurements may take place pursuant to the arrangements of the parties. Plaintiff Wilson's Motion to Compel defendant NPBL to produce the Personal

an accident took place involving allegedly defective appliances and appurtenances. *Mulligan v. Eastern S.S. Lines, Inc.*, 6 F.R.D. 601 (S.D. N.Y. 1946). While this Court recognizes the limitations of the analogy, plaintiff Wilson's request here is somewhat akin to asking that a vessel be moved to a particular drydock where an accident took place for reenactment when there is no substantive allegation of defective appliances or appurtenances.

184

Injury Summary Report (PISR) and accident investigation memorandum is denied. The briefs of the parties addressing these issues are ordered filed. Since the parties have stated their positions on the record, and/or in their pleadings, and since a court reporter was present at the September 6, 2005, hearing, the Court will dispense with the Va. Sup. Ct. Rule 1:13 counsel endorsement requirement. It is so ordered.